2001 UT 92

**STATE of Utah, Plaintiff and Appellee,**

**v.**

**Harlan Lee HAMMOND, Defendant and Appellant.**

**No. 20000487.**

Supreme Court of Utah.

Oct. 19, 2001.

Mark L. Shurtleff, Att'y Gen., Joanne C. Slotnik, Asst. Att'y Gen., Salt Lake City, Michaela Andruzzi, Salt Lake City, for plaintiff.

Joan C. Watt, Robert K. Heineman, Salt Lake City, for defendant.

DURHAM, Justice:

¶ 1 Defendant Harlan Lee Hammond pled guilty to attempted rape of a child, a first degree felony carrying a mandatory prison term of three years to life. *See* Utah Code Ann. § 76–5–402.1 (1999). The trial court denied probation and ordered execution of the sentence. Hammond appeals the denial of a motion to alter or amend the judgment pursuant to section 76–5–406.5 of the Utah Code. We reverse and remand.

## BACKGROUND

¶ 2 There was no preliminary hearing or trial in this case, and the following facts are taken from the presentence report relied upon by the trial court in sentencing. The defendant and the victim (B.) encountered

each other in early September 1999 on the internet. B., who liked defendant's screen profile, began to "chat" with him online. According to B., she told defendant she was fourteen and he told her he was seventeen. In fact, B. was thirteen years old. Defendant says B. told him she was seventeen and denies telling her that he was seventeen. Actually, he was twenty, and his online screen name apparently included his date of birth. B. eventually gave defendant her telephone number, and they talked by telephone several times before agreeing to meet at a Salt Lake elementary school in mid-September.

¶ 3 Defendant and B. met one afternoon, drove in defendant's truck to a park where they walked and talked, and then drove to a "make-out point" near the State Capitol. According to B., the defendant tried to kiss her several times, but she told him "no," and he stopped. He then drove her back to the vicinity of the school around ten o'clock.

¶ 4 Following this first meeting, the two continued to communicate online and on the telephone. According to defendant, they met again about a week later, when he picked B. up in the late afternoon and spent the evening watching movies at his friend's house. Around midnight, they drove to defendant's house, where they watched more movies, lay on a bed, and rubbed each other sexually over their clothing. Defendant then dropped B. off at the location where he had met her earlier.

¶ 5 Toward the end of September the two met again. B.'s version is that they drove first to a park, where she willingly "made out" with defendant. Then they drove to an elementary school where they kissed some more. B. said that defendant tried to pull down her pants, but she told him "no" several times and put her fingers through her belt loops to keep her pants up. He persisted and succeeded in pulling down her pants and underwear. He then pulled down his own pants, got on top of her, and they had sexual intercourse. B. said that she repeatedly told defendant "no," and that she "didn't want to be doing this."

¶ 6 Defendant's version is substantially similar up to the point of intercourse. He stated that he and B. had been kissing, that B. had touched his penis under his clothing, and that he had touched her breasts and digitally penetrated her vagina. He agreed that B. had said "no," but maintained that it was said "jokingly" and only at the beginning of the encounter. He said she did not object or give any sign of objecting during intercourse.

¶ 7 Defendant and B. subsequently saw each other once or twice, but had no further sexual relations. The incident came to light when B.'s mother learned that her daughter had been sexually active with a 20–year–old, and telephoned defendant's parents and the police. When confronted by her mother, B. at first denied any sexual involvement. She later admitted that she had sexual intercourse with defendant, but maintained it had been without her consent.

## ANALYSIS

¶ 8 The only issue raised on appeal is whether the trial court erred in determining that defendant was not eligible for probation under section 76–5–406.5 of the Utah Code. We review sentencing decisions under an abuse of discretion standard. *State v. Gibbons,* 779 P.2d 1133, 1135 (Utah 1989). Section 76–5–406.5 of the Utah Code provides in part that a defendant convicted of the crime to which defendant pled guilty may be considered for probation to a residential sexual abuse treatment center only if

> [A]ll of the following circumstances are found by the court to be present and the court in its discretion, considering the circumstances of the offense, including the nature, frequency, and duration of the conduct, and considering the best interests of the public and the child victim, finds probation to a residential sexual abuse treatment center to be proper:
>
> (a) the defendant did not use a weapon, force, violence, substantial duress or menace, or threat of harm, in committing the offense or before or after committing the offense, in an attempt to frighten the child

victim or keep the child victim from reporting the offense. . . .

Utah Code Ann. § 76–5–406.5(1)(a) (1999).

■ ¶ 9 The defendant argues that the trial court incorrectly construed the language "in committing the offense or before or after committing the offense, in an attempt to . . . keep the child victim from reporting the offense," to require that force or violence be used only in an attempt to prevent disclosure of the crime, not in its commission. We reject that argument summarily, believing that the statute's plain language includes "in committing the offense." It is true that an additional comma inserted at the end of the phrase would improve the sentence's grammatical structure, but its meaning is plain.

■ ¶ 10 The presentence report prepared by the Department of Adult Probation and Parole (AP & P) recommended probation with twelve months jail time, mandatory treatment in an approved program, restitution, and other conditions. The trial court declined to follow the recommendation after the prosecutor argued that defendant had used "force or duress" in accomplishing sexual intercourse with the victim. The following in-court exchange occurred:

DEFENSE COUNSEL: [M]y client stoutly denies that he forced her to have this intercourse.

THE COURT: Well, that may be his position.

DEFENSE COUNSEL: If we need to have an evidentiary hearing on that as well, and we didn't have the benefit of the preliminary hearing here to further explore.

THE COURT: Well, it's kind of too late; isn't it?

DEFENSE COUNSEL: That's true, Judge.

THE COURT: It's a done-deal now. Maybe we ought to hear from her. Is she here?

PROSECUTOR: The victim? She is.

THE COURT: Tell me anything you want.

THE VICTIM: I thought I knew what I was going to say, and I forgot.

THE COURT: Think about it for a minute.

THE VICTIM: I'm not putting all the blame on Harlan. I know I played a big part in all this and I know that I screwed up big. I just think that he is a lot older than me and he should have more of an awareness. And it just—I mean I know I've done wrong. . . . And it's just something that shouldn't have happened and I'm not mad at Harlan. I don't hate him. I forgive him for doing something stupid because everybody makes mistakes.

¶ 11 Despite the court's awareness at the time of the foregoing exchange that there were contradictory versions of events regarding the use of force in the offense, the court failed to ask the victim to speak to it, and thereby lost the opportunity to have the victim clarify her position and/or to allow the defendant's counsel to challenge it. Contrary to the court's observation (concurred in by defense counsel) that it was a "done deal," the issue of force was in fact still an open question at the time of sentencing. The defendant was charged with rape of a child, and pled guilty to attempted rape of a child. Force is not an element of either offense under Utah law. *See* Utah Code Ann. § 76–5–402.1 (1999). ("A person commits rape of a child when the person has sexual intercourse with a child who is under the age of 14.") Defendant never admitted to the use of any kind of force, claiming consistently in his interviews and written statements that the intercourse was completely consensual.

¶ 12 Furthermore, the presentence report is not conclusive on the question of force, containing as it does the contradictory assertions of the defendant and the victim:

[B.] stated she "made out" with Harlan willingly. She indicated they kissed, but there was no touching done by either party. B. stated they left the "make-out point" and returned to [Salt Lake elementary school], where Harlan parked behind the school. . . . While there, they started to kiss some more. B. stated Harlan then tried to pull down her pants in a "joking manner," and she told him "no" several times. . . . She stated she reached down and put her fingers in her belt loops, to

keep her pants up; however, the defendant was able to pull down her pants anyway, along with her underwear. B. states Harlan then pulled down his pants, and got on top of her on the bench seat of his pickup truck. B. stated the defendant put his penis inside her vagina and, "did his little thing" for about 15 minutes. B. explained she was referring to the defendant performing full vaginal intercourse on her. She claimed she repeatedly told the defendant "no," and that she did not want to be "doing this." B. stated, after approximately 15 minutes, the defendant got off her, apologized for what had happened, and told her he would drive her home. She stated she pulled up her pants and walked home, instead. She stated Harlan asked her not to tell anyone, because he would be arrested for "statutory rape." B. told him she wasn't planning on telling anyone, because Harlan had apologized for what he had done.

. . . .

The defendant stated, on approximately September 25th, he met B. at [a Salt Lake elementary school] . . . , and they had sexual intercourse in his truck. . . . Harlan was asked what led up to this, and [he] stated they "just started kissing," and B. touched his penis, under his clothing. He also touched her breasts and vagina, skin to skin, including digital penetration of her vagina. The defendant stated he removed his own clothing, as well as B.'s. He was asked if she ever said "no," and he stated she did say "no," but said it "jokingly," right at first. He claimed she did not utter any form of objection when they were having sexual intercourse. Harlan stated the sex lasted five to ten minutes, and B. seemed to enjoy having intercourse with him, but said nothing while it was occurring. Harlan stated he wore a condom, which B. observed him putting on. . . . The defendant denied ever apologizing before, during, or after having intercourse with her.

. . . .

The defendant stated B. told him she was 16 years old, and would be 17 in two weeks, and that she was a sophomore at Taylorsville High School. . . . The detective noted the defendant was very cooperative throughout the interview.

¶ 13 In the "comments" portion of the presentence report, the staff person preparing the report noted:

[Harlan] denied ever telling the victim he was [seventeen], denied forcing her to submit to intercourse, and denied she ever told him she was [thirteen]. The defendant claims the victim told him she was [seventeen] years of age. He denied ever apologizing to the victim.

¶ 14 Thus, the presentence report is inconclusive on the issue of defendant's use of force. There exists no means for determining the relative credibility of the only two persons with first-hand knowledge of the facts. Defendant, of course, had every motivation in his interviews to minimize his wrongdoing. The victim also, however, may have had reason to minimize or deny any voluntary participation in the incident to avoid blame from her mother. She did not report the encounter, continued to have contact with the defendant by telephone, and met him again after having intercourse. The incident only came to light sometime later, when B's mother learned of the encounter from another source and confronted B.B. initially denied having sexual intercourse with defendant, but, according to the presentence report, "later changed her story, and acknowledged having intercourse with Harlan, but stated that it was not with her consent."

¶ 15 In light of the unresolved factual question regarding force, the trial court erred in excluding the defendant from consideration for probation under subsection (a) of the statute. As defense counsel summed up his arguments to the court regarding the court's options, focusing on probation, the court commented: "No. I think the problem that we have is he just doesn't meet the criteria." When asked to specify which criteria, the court said: "I think a particular element. I think there was force involved. I think the little girl said no. . . . I mean otherwise what does it matter? What does it matter if someone says, no? I believe that no means no. . . . This girl was [thirteen]

years old and she said no and he chose to ignore it."

¶ 16 Unfortunately, the trial court's comments reflect a misunderstanding of the elements of the underlying offense in this case, and the relationship between nonconsent and force under Utah rape law. Intercourse without consent is all that is required for rape pursuant to section 76–5–402; no force is required. The element of consent is also absent from the definition of the offense of rape of a child, which is a "strict liability" offense even if committed with the actual consent, or willing participation, of the victim. There are two crimes in the Utah Code for which nonconsensual, nonforceful acts are defined as "forcible": "Forcible sodomy" and "Forcible sexual abuse" both in section 76–5–404. Like rape and rape of a child, however, both of these crimes may be prosecuted solely on the basis of lack of consent by the victim, absent any actual force or violence, even though their titles suggest otherwise. Force and violence, in the form of causation of bodily injury, use of a dangerous weapon, and threat, are treated in Utah's statutory scheme as separate elements of the offense of "Aggravated sexual assault" in section 76–5–405, and apply only to aggravate other offenses (rape or attempted rape, object rape or attempted object rape, forcible sodomy or attempted forcible sodomy, or forcible sexual abuse or attempted forcible sexual abuse) that require only nonconsent, not force, to prove. The kind of threat and violence dealt with in the aggravated sexual assault statute does not even apply to the crime of rape of a child, presumably because rape of a child already carries the same penalty, a minimum mandatory sentence, as aggravated sexual assault.

¶ 17 Thus, under Utah rape law, ignoring a victim's "no," standing alone, may be sufficient for a conviction for rape, even without the use or threat of force. In the case of rape of a child, because the victim is by definition legally incapable of giving consent, the act of intercourse itself satisfies the statute; neither nonconsent nor force is an element of the crime. Therefore, the trial court was mistaken when it assumed, as it appears to have done, that ignoring a victim's

"no" was enough to qualify as use of "a weapon, force, violence, substantial duress or menace, or threat of harm, in committing the offense" within the meaning of section 76–5–406.5(1)(a) of the Utah Code. This statute applies exclusively to sex offenses against a child, and therefore takes into account the fact that the offenses themselves can be committed in a nonviolent manner, where actual consent is irrelevant. The defendant's plea therefore did not include any implicit admission as to force or violence.

¶ 18 Compounding the trial court's apparent misperception of the import of the law is the presence of conflicting facts in the record on the critical question: did the defendant use "force or violence" in the commission of sexual intercourse with the victim? The defendant consistently denied any use of force. The victim's statements never really address the question directly except for the reported assertion that the defendant took down her pants "anyway" when she was trying to hold them up. The apparent fact that she said "no" at some point only tended to show nonconsent, a nonissue in this crime, not force. Even when the court turned to the victim for clarification in open court, she said nothing about the central question of force, notwithstanding the fact that it had been the focus of the immediately preceding exchange between the court and counsel.

¶ 19 Given that the issue of force appears to have been the trial court's primary reason for denying defendant eligibility for probation under section 76–5–406.5, we conclude the defendant is entitled to an evidentiary hearing and findings of fact on that question. Of course, the trial court has great discretion under the language of the statute and sentencing law generally, and will be under no obligation to afford the defendant probation even if it concludes that the evidence shows no use of force or violence. When such broad considerations as "the best interests of the public and the child victim" are identified by the statute, we generally review sentencing decisions under an abuse of discretion standard. *State v. Gibbons*, 779 P.2d 1133, 1135 (Utah 1989) (holding that an appellate court will set aside a sentence only

if there is abuse of discretion, if the trial court failed to consider all legally relevant factors, or if the sentence exceeds legal limits).

¶ 20 Our concern in this case is with the process and with a clarification of the role of consent and force in the law. It appears possible from the record in this case that the trial court might have weighed the options differently if it had focused on the fact that neither defendant's plea, nor his conviction, nor the state of the conflicting "evidence" in the presentence report justified the factual conclusion that defendant used force to accomplish this offense. "The need for evidentiary reliability in sentencing proceedings is greater when specific factual issues must be resolved." *State v. Johnson*, 856 P.2d 1064, 1071 (Utah 1993), *superseded by statute on other grounds as indicated in State v. Tryba*, 2000 UT APP 230, ¶ 19, 8 P.3d 274.

██ ¶ 21 The State has argued on appeal that the issue of force was not the only basis for the trial court's refusal to consider defendant for probation, and that defendant did not fulfill two of the other requirements in the statute. Subsections (h) and (i) of section 76–5–406.5(1) of the Utah Code provide:

> (h) the defendant admits the offense of which he has been convicted and has been accepted for mental health treatment in a residential sexual abuse center that has been approved by the Department of Corrections under Subsection (3);
>
> (i) rehabilitation of the defendant through treatment is probable, based on evidence provided by a treatment professional who has been approved by the Department of Corrections and the Department of Human Services under Subsection (3) and who has accepted the defendant for treatment[.]

Utah Code Ann. § 76–5–406.5(1)(h) and (i) (1999).

¶ 22 The trial court, after its discussion of the force issue discussed above, commented as follows: "[I]n reading this report, [defendant] does have a poor prognosis for improvement. He think[s] maybe if he gets into an intensive out-patient or residential program something might be able to be done

about it. But he has pedophilic interests. The younger the age the more aroused Harlan appears to be at abusing force and coercion to gain sexual access." These comments presumably refer to the contents of a Psychological Evaluation requested by AP & P as part of their presentence investigation. The report was prepared by a Ph.D. psychologist at the Center for Family Development. Unfortunately, the AP & P staff person doing the presentence investigation appears to have misunderstood the sentencing options available for a defendant convicted of this offense, which were limited to imprisonment for the mandatory minimum term or probation under the conditions of section 76–5–406.5. Consequently, AP & P's sentencing recommendation was for probation with some jail time and treatment from an approved provider, an option not available for the crime of which defendant was convicted except under the stringent conditions specified by section 76–5–406.5. The presentence report does not even mention the statute, and it is clear from the psychological evaluation that the evaluator was not asked to address the specific questions that the statute identifies in subsection (j):

> (j) the defendant has undergone a complete psychological evaluation conducted by a professional approved by the Department of Corrections and the Department of Human Services and:
>
> > (i) the professional's opinion is that the defendant is not an exclusive pedophile and does not present an immediate and present danger to the community if released on probation and placed in a residential sexual abuse treatment center; and
> >
> > (ii) the court accepts the opinion of the professional[.]

Utah Code Ann. § 76–5–406.5(1)(j) (1999).

¶ 23 The evaluation contains a number of comments relevant to the questions treated in this subsection, but it is highly inconclusive on the central issues of exclusive pedophilia and treatment. The "DSM IV DIAGNOSTIC IMPRESSIONS," in the report, for example, are (1) "Provisional: Pedophilia, Attracted to Females, Unspecified"; "Adjustment Disorder with Mixed Anxiety and Depressed Mood"; and (3) "Provisional:

Personality Disorder NOS with Dependent Traits." Thus the pedophilia diagnosis is only provisional, and the report contains no indication of the reliability of the sexual arousal tests on which the diagnosis was predicated. However, the evaluator does opine that:

> In sum, it appears that Harlan represents about a medium risk for reoffense and a poor prognosis for treatment. Harlan's rationalization and his sexual arousal results suggest however, that he is in need of sex offender therapy. It is on this basis that treatment is recommended. Perhaps Harlan's prognosis for a good outcome will be improved if he is required to participate in either an intensive outpatient or a residential program.

Thus, the evaluator failed to address the question of whether defendant is or is not an exclusive pedophile (defendant's history of sexual relations with only two other, age-appropriate partners might bear on this question but is not discussed by the evaluator), and whether he presents an immediate and present danger to the community, although the evaluator's recommendation for treatment might suggest a view on this question. Certainly the evaluator's comment about "poor prognosis" is relevant, but even that does not directly address the "rehabilitation" concerns of subsection (i), nor is it the evidence of a "treatment professional who has been approved ... and who has accepted the defendant for treatment," as the subsection requires.

## CONCLUSION

¶ 24 We conclude that there were serious problems with the process followed in the sentencing determination that occurred in this case. These problems may largely be attributed to the apparent inadequacies of the investigation conducted by AP & P. The record does not reflect at what point the error occurred, but the presentence report's recommendation, as well as the contents of the Psychological Evaluation, make it obvious that none of the evaluators understood the penalty options or specifically considered the requirements of section 76–5–406.5. The Evaluative Summary of the presentence report, for example, concluded with this observation:

> This department views the offense as very serious; however, given the defendant's youth, lack of significant prior criminal history, family and community support and willingness to participate in treatment, commitment to the Utah State Prison is not viewed as justified in this case, at the present time. A significant period of incarceration, however, is deemed necessary, given the seriousness of this offense.

¶ 25 We emphasize that trial courts have considerable discretion in refusing probation in any case, but particularly in cases in which eligibility for probation is predicated on compliance with the requirements of section 76–5–406.5. We set aside the sentence imposed by the trial court here not because we disagree with it, or because it is outside the court's discretion. Rather, we are concerned that the trial court's discretion may not have been properly informed at the time it was exercised, due, first, to a possible misperception about the interaction between nonconsent and force in Utah law; second, to a mistaken assumption about sentencing options that affected the investigation and reports of the presentence evaluators; and third, to a factual conclusion about the use of force in this offense that was not justified by the state of the record. We therefore reverse and remand so that the presentence report and Psychological Evaluation may be redone or revised to reflect the applicable statutes and standards, and so that the trial court may conduct a new sentencing hearing and make factual findings on the force issue, if that is necessary.

¶ 26 Associate Chief Justice RUSSON, Justice DURRANT, and Justice WILKINS concur in Justice DURHAM's opinion.

Chief Justice HOWE, dissenting:

¶ 27 I dissent. I do not agree that the trial court misunderstood or misperceived either the facts or the law. Section 76–5–406.5(1)(a) provides that a defendant convicted of the crime to which Hammond pled guilty may be considered for probation to a residential abuse treatment center if, among other things, force was not used. In sentenc-

ing, the trial court clearly addressed the issue of force and found that it had been used in the commission of the crime. The court remarked:

I think there was force involved. I think the little girl said no ... I mean otherwise what does it matter ... if someone says, no? I believe that no means no.... This girl was [thirteen] years old and she said no and he chose to ignore it.

¶ 28 The trial court had before it the presentence report in which the victim stated to the investigator that she repeatedly told the defendant "no," and that "she did not want to be doing this." She stated that the defendant tried to pull down her pants, and she told him "no" several times. As if her protestation was not sufficient, she additionally told the investigator that "she reached down and put her fingers in her belt loops to keep her pants up; however, defendant was able to pull down her pants anyway, along with her underwear."

¶ 29 It is true that at the sentencing hearing, the victim was not asked and did not comment on the use of force. However, that was not necessary. The trial court had before it the presentence report with the statements made by both the victim and defendant. In his statement, the defendant admitted that the victim said "no," but that he thought she said it jokingly. The majority does not explain why the trial court could not rely on the victim's statement to the presentence investigator. In many criminal cases, the trial court at sentencing must choose between divergent statements made by the victim and the defendant. Here, the trial court accepted the statement of the victim that the defendant used force, and this court should accept it as well.