2018 UT App 8

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MICHAEL AARON CADY,
Appellant.

Opinion
No. 20151018-CA
Filed January 11, 2018

Third District Court, Salt Lake Department
The Honorable Katie Bernards-Goodman
No. 131903414

Joanna E. Landau, Michael D. Misner, Elise C.
Lockwood, and Diana K. Pierson, Attorneys
for Appellant

Sean D. Reyes and Marian Decker, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES JILL M. POHLMAN and RYAN M. HARRIS concurred.

MORTENSEN, Judge:

¶1      No means no. So does "unh-unh," especially when accompanied by a host of other nonverbal cues—such as pushing an assailant away, turning away from him, crying, and curling up in fetal position. When Defendant Michael Aaron Cady ignored Victim's several expressions of nonconsent, he committed object rape. He now challenges a jury's conviction of him for that crime, arguing the evidence was insufficient to support a conclusion (1) that Victim did not consent to the encounter or (2) that he was reckless with regard to her nonconsent. He also argues that because the jury returned

inconsistent verdicts, his conviction must be reversed. We disagree and affirm his conviction.

BACKGROUND

¶2     Victim was friends with Defendant's wife when she stayed on the couple's couch one evening. Another friend slept, "passed out" on the floor nearby. Victim had not yet fallen asleep when Defendant came into the living room, knelt down beside her, and started "rubbing her midsection over her blanket." Victim was turned away from Defendant, facing the back of the couch. Defendant proceeded to touch Victim under the blanket, whisper something in her ear, and kiss her shoulder and neck. Victim's response to these advances was to push his hand off of her and say "unh-unh." Defendant then tried to pull Victim's pants down. Victim shook her head and held onto her pants, curling up her legs.

¶3     Defendant eventually succeeded in pulling Victim's pants down and "got behind [Victim] on the couch, where [her] legs were folded towards [her] belly," so Victim tried to push him away with her arm and leg. Rather than leave her alone, Defendant twisted Victim's arm behind her, slapped her arm down, and then Victim felt something rubbing against her vagina and buttocks. Defendant next inserted something "very sharp" into Victim's vagina, got up, and left the room. While Victim did not testify as to what this sharp object was—only that it did not feel like a penis—Defendant acknowledged in a police interview (which was presented to the jury) that "he had put his fingers in [Victim's] vagina." We thus talk in terms of digital penetration throughout this opinion.

¶4     For this incident, the State charged Defendant with object rape. A jury convicted him on that charge.

¶5     Separate from this crime, there were two additional sexual encounters between Defendant and Victim. The

circumstances surrounding those encounters are pertinent insofar as they relate to Defendant's claim that Victim's account of the object rape was inherently improbable. One of these encounters occurred five minutes after the object rape. The other had taken place more than a year before.[1]

¶6     After inserting his fingers into Victim's vagina, Defendant left the room for approximately five minutes. When he came back, he had sex with Victim. Victim maintained that the sex was not consensual. She testified that she tried to pull her pants back up, was crying, and remained in fetal position. We refer to this encounter as the April incident.

¶7     More than a year before the object rape, Defendant and Victim had had sex, which Victim maintained was nonconsensual. During that earlier incident, Victim also had been staying on Defendant's couch. Defendant entered the living room after his wife had gone to bed and curled up on the couch behind Victim. Victim testified that she had closed her eyes and remained quiet. Defendant pulled down Victim's pants, rubbed his penis around her vagina and buttocks, and then inserted his penis into her vagina. During penetration, Victim testified, she had started crying and reached behind her to push Defendant away, "but it didn't work." After Defendant got up, saying something like "thanks for a great night," he returned to the bedroom. Victim pulled her pants back up and remained on the couch crying. We refer to this encounter as the January incident.

¶8     Victim reported all three incidents to the police on the morning after the object rape. Based on her assertion that she had not given her consent to any of the encounters, the State charged Defendant not only with object rape but also with two counts of rape. At trial, the jury acquitted Defendant of the two rape charges. He now appeals his conviction for object rape.

---

1. Defendant agreed that these encounters took place; the dispute at trial was whether they were consensual.

ANALYSIS

¶9     The focus of this appeal is consent—whether the State proved beyond a reasonable doubt Victim's lack of consent to digital penetration and Defendant's mental state as to her lack of consent. More particularly, Defendant contends that because the evidence of nonconsent was not credible and thus was insufficient to support a conviction for object rape, that conviction should be overturned. When on appeal a defendant argues that there was insufficient evidence to support his or her conviction,

> we may reverse only when it is apparent that there is not sufficient competent evidence as to each element of the crime charged. Our review of the evidence itself is deferential. We may reverse a verdict only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that [the] defendant committed the crime for which he or she was convicted.

*State v. Bagnes*, 2014 UT 4, ¶ 10, 322 P.3d 719 (cleaned up).[2] Necessary to our analysis, then, are the elements of object rape.

---

2. The parenthetical "cleaned up," while perhaps unfamiliar, is being used with increasing frequency to indicate that internal quotation marks, alterations, and/or citations have been omitted from a quotation. For an example of its use in a published opinion, see *United States v. Reyes*, 866 F.3d 316, 321 (5th Cir. 2017). For a more thorough discussion regarding the practicality of the parenthetical, see Jack Metzler, *Cleaning Up Quotations*, Journal of Appellate Practice and Process (forthcoming 2018), https://ssrn.com/abstract=2935374 [https://perma.cc/XRQ4-WCLX]. Finally, for a graphic representation of the phrase's trend in popularity among legal writing circles, see

(continued…)

¶10  To be found guilty of object rape under the facts of this case, Defendant must have (1) caused the penetration, however slight, of Victim's genital opening (2) without her consent (3) by any foreign object, including part of the human body other than the mouth or genitals (4) with intent to cause substantial emotional or bodily pain to Victim or with the intent to arouse or gratify the sexual desire of any person. *See* Utah Code Ann. § 76-5-402.2 (LexisNexis Supp. 2017). Because Defendant acknowledged that he had put his fingers in Victim's vagina, neither element (1) nor (3) was in dispute. *See id.* And because Defendant maintained that the encounter was consensual, he seems to, at least implicitly, acknowledge that he did so "with the intent to arouse or gratify the sexual desire of any person." *See id.* But he challenges the evidence of his mental state when it comes to the general mens rea for object rape. He specifically argues that the State "failed to prove [Defendant] acted recklessly as to [Victim's] non-consent to digital penetration, as he did not 'consciously disregard[] a substantial and unjustifiable risk that' [Victim] did not consent to the digital penetration." (Quoting Utah Code Ann. § 76-2-103(3) (LexisNexis 2012).) We thus first tackle the question whether sufficient evidence supported the jury's finding that Victim did not consent. Because we answer that question in the affirmative, we then consider whether sufficient evidence supported the jury's finding that Defendant acted recklessly with regard to that lack of consent. Finally, we address Defendant's contention that inconsistent verdicts render his conviction unsupported.

## I. Nonconsent

¶11  The evidence at trial was sufficient to support a finding that Victim did not consent to digital penetration. A victim

---

(…continued)
@SCOTUSPlaces, Twitter (Sept. 22, 2017, 7:03 AM), https://twitter.com/SCOTUSPlaces/status/911229408689696768 [https://perma.cc/4FKJ-QYSE].

might "express[] lack of consent through words or conduct." Utah Code Ann. § 76-5-406(1) (LexisNexis Supp. 2017). "Nonconsent cannot be determined simply by asking whether a person physically fought back or attempted to escape." *State v. Reigelsperger*, 2017 UT App 101, ¶ 80, 400 P.3d 1127. Rather, "[t]he essence of consent is that it is given out of free will, and determining whether someone has truly consented requires close attention to a wide range of contextual elements, including verbal and nonverbal cues." *Id.* ¶ 81 (cleaned up).

¶12 The contextual elements involved in this case included both verbal and nonverbal cues. Victim said "unh-unh" when Defendant approached her on the couch. Defendant does not dispute that she said this, nor does he dispute that "unh-unh" means "no."[3] Further, Victim testified that she pushed Defendant's hand off of her, held her pants up when Defendant first tried to pulled them down, and pushed against Defendant with her arm and leg, all while crying and curling up in a ball, facing away from Defendant.

¶13 Defendant nevertheless contends that this testimony was insufficient because it "did not establish that she expressed a lack of consent by words or conduct." He argues that it was not enough for Victim to say "'unh-unh' only one time but then exhibit[] vague body language."[4] We disagree and conclude that

---

3. Defendant's subjective interpretation of this verbal cue is discussed in our analysis of whether Defendant was reckless as to Victim's nonconsent. *See infra* ¶¶ 29–31.

4. Defendant rests his argument, in part, on his statement to police that after Victim said "unh-unh," he "told her that if she had a problem to tell him to go away." Victim maintained that in response, she "was shaking her head no." We discuss the implications of this exchange in greater detail when discussing whether Defendant was reckless as to Victim's nonconsent. *See infra* Part II.

Victim's verbal and nonverbal conduct was sufficient for a jury to find that she did not consent to Defendant's conduct.

¶14 To begin, our supreme court has previously indicated that "under Utah rape law, ignoring a victim's 'no,' standing alone, may be sufficient for a conviction for rape, even without the use or threat of force." *See State v. Hammond*, 2001 UT 92, ¶ 17, 34 P.3d 773. Because both rape and object rape require a finding of nonconsent, *see* Utah Code Ann. §§ 76-5-402, 76-5-402.2, we see no reason why the supreme court's pronouncement should not apply in the present case. Thus, Defendant's decision to ignore Victim's "unh-unh" might alone have been sufficient to sustain Defendant's object rape conviction. *See Hammond*, 2001 UT 92, ¶ 17. And the jury heard more evidence of nonconsent than Victim's "unh-unh." It also heard testimony regarding Victim's nonverbal indications of nonconsent. *See* Utah Code Ann. § 76-5-406(1) (explaining that a victim's lack of consent may be expressed "through words or conduct").

¶15 Given Victim's account of crying, pushing against Defendant, and closed body language, which account the jury apparently credited, we will not disturb the jury's finding of nonconsent.

> As a general rule, consent—or nonconsent, to put it in terms of an element of a crime—is a fact-intensive, context-dependent question, decided on a case-by-case basis. To determine whether a victim has truly consented, the factfinder must pay close attention to the verbal and nonverbal cues given by the victim and to a wide range of other elements of context. These and other contextual nuances are the reason why, as a general rule, our law has long left the matter of consent in the hands of the jury.

*State v. Barela*, 2015 UT 22, ¶ 39, 349 P.3d 676 (footnote and citation omitted).

¶16    Defendant separately argues that because Victim's testimony was inherently improbable and internally inconsistent, his conviction cannot stand. He argues that credibility issues with Victim's testimony made "any testimony as to her non-consent to object rape[] 'so weak that no reasonable jury could find the defendant guilty beyond a reasonable doubt.'" (Quoting *State v. Robbins*, 2009 UT 23, ¶ 18, 210 P.3d 288.) In so arguing, Defendant misapprehends our jurisprudence regarding inherent improbability and internal inconsistency.

A.    Inherent Improbability

¶17    Although our supreme court has established a significant barrier in succeeding on claims of inherent improbability, Defendant nevertheless attempts to fit his argument within the confines of this narrow doctrine. He fails.

¶18    The predominant case for considering claims of inherent improbability is *State v. Robbins*. In that case, our supreme court clarified "the scope of the inherent improbability doctrine." *Id.* ¶ 13. It is difficult to successfully establish such a claim on appeal. Indeed, in *State v. Prater*, the supreme court focused in on minute details in *Robbins* that allowed for a determination of inherent improbability: "It was the inconsistencies in the child's testimony *plus* the patently false statements the child made *plus* the lack of any corroboration that allowed this court to conclude that insufficient evidence supported Robbins's conviction." 2017 UT 13, ¶ 38, 392 P.3d 398 (emphasis in original). Defendant's arguments in the present case do not add up to a conclusion that Victim's testimony was inherently improbable.

¶19    "[W]itness testimony is inherently improbable and may likewise be disregarded if it is (1) physically impossible or (2) apparently false." *Robbins*, 2009 UT 23, ¶ 16. And our supreme court has specified when testimony fits into one of these two categories: "Testimony is physically impossible when what the witness claims happened could not have possibly occurred. . . . On the other hand, testimony is apparently false if

its falsity is apparent, without any resort to inferences or deductions." *Id.* ¶ 17 (cleaned up). Furthermore, "the definition of inherently improbable must include circumstances where a witness's testimony is incredibly dubious and, as such, apparently false." *Id.* ¶ 18.

¶20  In very general terms, Defendant argues that Victim's testimony was "similar to cases where Utah courts have disregarded witness testimony as . . . 'inherently improbable.'" (Quoting *id.*) But he does not specify whether or how the testimony was physically impossible or apparently false. Instead, he points to evidence that might have undermined the credibility of Victim's testimony. However, this sort of evidence does not fit within the framework for considering inherent improbability.

¶21  We recently had occasion to consider when the "*Robbins* inherent improbability test does not apply." *See State v. Crespo*, 2017 UT App 219, ¶ 28, *petition for cert. filed*, Nov. 27, 2017 (No. 20170920). In *Crespo*, we explained that *Robbins* was inapplicable where "there was circumstantial evidence presented to the jury that supported finding [the defendant] had perpetrated the crimes charged," and "other evidence corroborated . . . testimony" the defendant later claimed was inherently improbable. *Id.* ¶¶ 28–31; *see also Prater*, 2017 UT 13, ¶¶ 39–41 (explaining that witnesses' inconsistent statements and plea deals were insufficient to render the witnesses' testimonies inherently improbable or apparently false).[5]

---

5. *State v. Prater*, 2017 UT 13, 392 P.3d 398, illustrates when credibility attacks do not "invoke the inherent improbability exception." *Id.* ¶ 39 (quoting *State v. Robbins*, 2009 UT 23, ¶ 22, 210 P.3d 288). In that case, the defendant raised issues relating to witness testimony when the witnesses "all made statements to police shortly after the [crime] that contradicted their trial testimony" and enjoyed "favorable treatment offered by the
(continued…)

¶22 Similarly, *Robbins* is inapplicable here. While it is understandable that a criminal defendant would want to cast his argument in terms of inherent improbability—because it allows a court to reassess a jury's credibility determination—Defendant's particular inherent improbability claim is not well taken. Instead, we consider his to be a garden-variety claim of insufficient evidence that he unsuccessfully tries to fit into the inherent-improbability box. At base, he contends that Victim's testimony should be disregarded because there was evidence presented that arguably undercut Victim's credibility. For instance, he highlights that Victim "came voluntarily to the apartment where she knew she would sleep on the same couch where she later claimed she had been raped" during the January incident. He also relies on evidence that Victim "threatened a witness to prevent the jury from hearing credible testimony" and "failed to indicate nonconsent at the time," along with "her boyfriend's testimony that he and [Victim] had sexual intercourse during her high-risk pregnancy."[6] But none of this evidence goes to inherent improbability. At best, it operated to undermine Victim's credibility by countering her testimony. *Cf.*

---

(…continued)
State." *Id.* ¶¶ 39, 41. Our supreme court specified that "inconsistent statements do not render . . . testimony 'apparently false'" and that "a plea deal by itself does not come within shouting distance of successfully demonstrating that a witness's testimony is 'apparently false' or that it falls under any of the other labels we have used to describe testimony that a reasonable jury could not rely upon to convict." *Id.*

6. At the time of the object rape and April incident, Victim was seven months pregnant and had experienced difficulties with the pregnancy. When she was with Defendant and his wife at their apartment, Victim had told them that, based on what her doctor had told her about the pregnancy, she could not have sex. But there was testimony at trial that Victim and her partner had sex the day before the April incident.

*State v. Garcia-Mejia*, 2017 UT App 129, ¶¶ 20–28, 402 P.3d 82 (considering a claim that victim testimony was inherently improbable and concluding that inconsistencies and contrary evidence did not render the testimony inherently improbable; instead, it created a credibility issue to be weighed by the jury). None of this evidence leads to a conclusion that Victim's testimony was physically impossible or apparently false. This is especially true where much of Victim's testimony was corroborated—by Defendant himself.

¶23 There is perhaps no more axiomatic statement when reviewing jury verdicts than this: The "choice between conflicting testimony is within the province of the jury." *State v. Pedersen*, 802 P.2d 1328, 1330 (Utah Ct. App. 1990) (cleaned up); *see also State v. Black*, 2015 UT App 30, ¶ 19, 344 P.3d 644 ("When the evidence presented is conflicting or disputed, the jury serves as the exclusive judge of both the credibility of witnesses and the weight to be given to particular evidence." (cleaned up)). Because Defendant's argument regarding inherent improbability relies on evidence that is neither physically impossible nor apparently false but instead implicates Victim's credibility as compared to other witnesses, we will not disturb the jury's verdict.

B.    Internal Inconsistency

¶24 When a witness's testimony is "internally inconsistent and conflict[s] as to the material elements of the crime charged," an appellate court might conclude that the evidence was insufficient to support a guilty verdict. *See id.* at 1330–31. And "[s]ubstantial inconsistencies in a sole witness's testimony, though not directed at the core offense, can create a situation where the prosecution cannot be said to have proven the defendant's guilt beyond a reasonable doubt." *State v. Robbins*, 2009 UT 23, ¶ 17, 210 P.3d 288.

¶25 Defendant argues that the jury's finding of nonconsent necessarily rested on Victim's testimony and that Victim's

testimony thus "had to be credible to support the conviction." First, this is not necessarily true. The jury heard the recording of a police interview with Defendant where he acknowledged that Victim initially said no to their encounter. And, as previously mentioned, "ignoring a victim's 'no,' standing alone, may be sufficient for a conviction for rape, even without the use or threat of force." *See State v. Hammond*, 2001 UT 92, ¶ 17, 34 P.3d 773. Second, even if the jury relied solely on Victim's testimony in finding that she did not consent to digital penetration, it was entitled to do so; Defendant has not shown that any inconsistencies rendered Victim's testimony such that "reasonable minds must have entertained a reasonable doubt that [Defendant] committed the crime for which he . . . was convicted." *See State v. Bagnes*, 2014 UT 4, ¶ 10, 322 P.3d 719 (cleaned up).

¶26 Most of Defendant's argument regarding internal inconsistencies is unrelated to Victim's testimony and is instead nothing more than a contention that the jury's verdicts were inconsistent. *See infra* Part III. But he also argues, with little analysis, "In this case, the evidence was inconsistent to prove object rape."[7] And he insists "there is insufficient evidence in light of witness testimony that is internally inconsistent." Yet Defendant never spells out what these supposed inconsistencies are. Instead, he establishes the general rule that internal

---

7. In making this assertion, Defendant directs our attention to the instruction in *Robbins* that a "court may choose to exercise its discretion to disregard inconsistent witness testimony only when the court is convinced that the credibility of the witness is so weak that no reasonable jury could find the defendant guilty beyond a reasonable doubt." 2009 UT 23, ¶ 18. But this statement from *Robbins* addressed a trial court's role in "considering a motion to arrest judgment." *Id.* And while Defendant made a motion to arrest judgment below, he has not asked us to review the trial court's ruling on that motion. Thus, this portion of *Robbins* is inapplicable.

inconsistencies might render testimony unreliable and then simply concludes, based on perceived inconsistencies in the jury's verdicts, that the rule should apply in this case.

¶27  Because Defendant has not established what aspects of Victim's testimony were internally inconsistent, we reject his challenge on this basis.[8]

## II. Recklessness

¶28  Defendant also contends that because there was insufficient, inherently improbable, and internally inconsistent evidence of Victim's nonconsent, the State failed to establish that he was "aware of but consciously disregard[ed] a substantial and unjustifiable risk that" Victim did not consent to the digital penetration. *See* Utah Code Ann. § 76-2-103(3) (LexisNexis 2012). Even if Defendant's argument were not premised on a conclusion we have already rejected, we would not be convinced.

¶29  In an interview with police—which the jury heard— Defendant acknowledged that Victim "stopped him at first[,] saying 'unh-unh.'" He said that her body language was "back and forth." He agreed that when a woman's body language is indecisive, "logic would be to take that as no." He told the police that he had "fucked up" and "felt like the biggest piece of shit in the world." And he admitted unconditionally that his fingers had penetrated Victim's vagina. These statements, without

---

8. Commingled with his arguments regarding inherent improbability and internal inconsistency is Defendant's pronouncement that "the evidence clearly established two adults could have heard [Victim] if she had wanted to stop [Defendant]." This statement is disconnected from any claim regarding inconsistency or improbability, and we in any event reject outright the suggestion that a victim is responsible for stopping her own sexual assault.

reference to any other evidence, demonstrate that Defendant was aware of a substantial and unjustifiable risk that Victim did not consent to digital penetration, but then he consciously disregarded that risk by nevertheless digitally penetrating her. *See id.*

¶30 Defendant nevertheless offers explanations for his conduct. He told police that, being "a very persuasive person" and having "a gift with people," he overcame Victim's initial hesitance; in his defense at trial, he claimed she "never directly said no." He argues that he encouraged Victim to "tell him to go away" if she had a problem with his advances. He claims that his statements regarding messing up and feeling guilty related to cheating on his wife, not assaulting Victim. He also professes that he "thought it was consensual."

¶31 Again, the jury has the freedom to believe or not to believe evidence presented to it. *See, e.g.*, *State v. Garcia-Mejia*, 2017 UT App 129, ¶ 24, 402 P.3d 82. "That it chose not to believe" Defendant's assertion that he thought his encounter with Victim was consensual "does not mean that Defendant's conviction is unsupported by the evidence." *See id.* This is especially true on the question of mens rea where the jury heard from Defendant directly that he heard Victim say "unh-unh" and considered her body language to be "back and forth." And Victim testified that when Defendant asked her if his conduct was okay, she shook her head no. There was sufficient evidence from which the jury could have found that Defendant was reckless regarding Victim's nonconsent, and thus we will not disturb that finding.

### III. Inconsistent Jury Verdicts

¶32 Finally, Defendant argues that because "the jury's verdicts are inconsistent," we are "require[d] . . . to reverse his object rape conviction." "When considering a defendant's argument that the verdicts are inconsistent," we will not reverse unless "reasonable minds could not rationally have arrived at

the verdict of guilty beyond a reasonable doubt." *State v. LoPrinzi*, 2014 UT App 256, ¶ 30, 338 P.3d 253. And

> so long as sufficient evidence supports each of the guilty verdicts, state courts generally have upheld the convictions. In other words, a claim of inconsistency alone is not sufficient to overturn the conviction; rather, there must be additional error beyond a showing of inconsistency because appellate courts have always resisted inquiring into the jury's thought processes and deliberations.

*Id.* (cleaned up). We have already concluded that sufficient evidence supports Defendant's conviction for object rape. Thus, Defendant must demonstrate some error beyond that of inconsistent verdicts. *See id.* He has not done so. Indeed, he has failed to demonstrate that the verdicts were even inconsistent. However, in part because Defendant devotes a significant amount of space in his brief arguing that the verdicts are inconsistent, we take the time to address those arguments.

¶33 In Defendant's view, we should reverse his conviction for object rape because the jury acquitted him of rape for both the January incident and the April incident; he argues that "all three counts rested on the jury's determination of [Victim's] credibility." He asserts that because nonconsent was an element of each offense, "if jurors believed her, they would convict on all counts; if they did not believe her, they would acquit on all counts." Implicit in this argument is a conflation of the three incidents. This is apparent in Defendant's repeated use of the term "same incident" when discussing the object rape and the April incident. Also implicit in this argument is the suggestion that credibility determinations must be all or nothing. We reject both of these premises.

¶34 Defendant was charged with three crimes for three separate encounters. The State was not tasked with proving

nonconsent for *all* encounters but for *each* encounter. Stated another way, the State's evidence had to separately establish nonconsent for the January incident, nonconsent for the object rape, and nonconsent for the April incident. The jury may have decided that the State did not meet its burden of proving nonconsent for the January incident or for the April incident but that it met its burden of proving nonconsent as to the object rape. There is nothing inconsistent about these verdicts, because the State introduced different evidence to attempt to establish nonconsent for each of the three incidents.

¶35 Regarding the January incident, Victim testified that she had closed her eyes and remained quiet. This is different from the evidence of Victim's "unh-unh" before the object rape. Also during the January incident, Victim said she started crying during penetration and reached behind her to push Defendant away, "but it didn't work." This is different from the testimony that Victim, prior to the object rape, cried, attempted to hold her pants up, shook her head no, and actually pushed against Defendant. We do not mean to suggest that there is a checklist of evidence that does or does not prove nonconsent, but by contrasting the evidence of nonconsent for these two encounters, it becomes apparent that the jury could have made separate determinations on these two charges.

¶36 Likewise, evidence of nonconsent for the April incident varied from evidence of nonconsent for the object rape. No verbal expression preceded the April incident. And while Victim testified that during both incidents she cried, tried to pull her pants back up, and remained in fetal position, the jury could have concluded that Victim's "unh-unh" or her pushing Defendant away during the object rape—or both—convinced them of her nonconsent beyond a reasonable doubt. Similarly, the lack of those behaviors during the April incident might have left a reasonable doubt in jurors' minds on the issue of nonconsent.

¶37    On the other hand, it is possible that neither the quantum nor quality of nonconsent evidence alone determined the jury's verdicts. Instead, it could have believed Victim's claim of nonconsent to the object rape while disregarding her claim of nonconsent to both the January and the April incidents. Defendant suggests that this would require "an improbable and unreasonable conclusion that [Victim] consented to sexual intercourse but not to digital penetration." At first blush, such a conclusion might seem improbable or unreasonable. But upon further inspection, it becomes apparent that the jury's conclusion was neither.

¶38    A jury's finding that the State did not meet its burden of proof of nonconsent is not a finding of the inverse—that there *was* consent—just as a verdict of "not guilty" is not a verdict of innocence. A jury is not tasked with deciding all issues absolutely. Instead, we ask only that it decide whether the State proved all elements of a crime beyond a reasonable doubt. When its answer is no, the jury enters a verdict of not guilty. When its answer is yes, it finds a defendant guilty. In the instant case, the jury answered "no" on the rape charges and "yes" to the object rape charge. It therefore may have decided only that the State had not proven nonconsent for the rape charges beyond a reasonable doubt, nothing more. It did not find, as Defendant suggests, that Victim "consented to sexual intercourse but not to digital penetration."

¶39    But even if it did, we cannot say that such a conclusion was not supported by sufficient evidence. The object rape and the April incident were separate events. Between the two, approximately five minutes passed, and Defendant got up, left the room, and then returned. It is not improbable or unreasonable, in this case, that an individual would refuse her consent to one activity and then, later, provide her consent to a different activity.

¶40    Given the myriad ways the jury might have reasonably reached its separate verdicts, we see no inconsistencies in them.

*Cf. Neff v. Neff*, 2011 UT 6, ¶ 49, 247 P.3d 380 ("[W]ith regard to a claim that a jury verdict is internally inconsistent, we resolve any inconsistency in favor of giving effect to a jury verdict.").

CONCLUSION

¶41 The evidence presented at trial was sufficient to support Defendant's conviction for object rape. Neither inherent improbabilities nor internal inconsistencies in the testimony provided at trial undermine that conclusion. Furthermore, the jury's acquittal of Defendant on the rape charges does not render the conviction for object rape inconsistent. We thus affirm.[9]

---

9. In his brief before this court, Defendant requested that we correct a clerical error in the record under rule 30(b) of the Utah Rules of Criminal Procedure. Because the trial court is better suited to make that correction, and because it is able to do so at any time under the rule, *see* Utah R. Crim. P. 30(b), we encourage Defendant to make the appropriate motion to the trial court.